BASIN EXPLORATION, INC.
v.
DENBURY MANAGEMENT, INC.
No. 2008 CA 1588.
Court of Appeals of Louisiana, First Circuit.
February 13, 2009.
Not Designated for Publication
REGINALD J. RINGUET, WILLIAM H. COLLIER, Attorneys for Plaintiff-Appellant, Basin Exploration, Inc.
TED M. ANTHONY, Attorney for Defendant-Appellee Denbury Onshore, LLC, Successor to Denbury Management, Inc.
Before: PARRO, McCLENDON, and WELCH, JJ.
WELCH, J.
Basin Exploration, Inc. ("Basin") appeals a summary judgment granted in favor of Denbury Onshore, L.L.C, the successor in interest to Denbury Management, Inc. ("Denbury"), that dismissed Basin's claim against Denbury for 6% of the working interest acquired by Denbury from ExxonMobil Corporation ("ExxonMobil")[1] in the Lirette Field, Terrebonne Parish, Louisiana. Based on the undisputed facts in the record before us, we find Denbury was entitled to judgment dismissing Basin's claim against it, and therefore, we affirm the judgment of the trial court.

I. FACTUAL AND PROCEDURAL HISTORY
The following material facts are not in dispute. On November 12, 1993, Denbury and Basin entered into an agreement. After a dispute between Denbury and Basin arose regarding the interpretation of that agreement, Denbury and Basin entered into an agreement dated October 21, 1998 ("the 1998 agreement"), to settle that dispute. The 1998 agreement, together with the assignment of the Pennzoil and Badger Acquisition leases,[2] superseded and replaced the November 12, 1993 agreement between the parties. Both Basin and Denbury acknowledge that the 1998 agreement "is a valid and binding agreement enforceable in accordance with its terms."
Pursuant to the terms of the 1998 agreement, Basin was entitled to
acquire 6% of Denbury's working interest ownership in new leases acquired by Denbury following the Pennzoil and Badger Acquisitions, insofar as same are unitized with the Pennzoil or Badger Acquisition leases where that portion of the unitized reservoir underling the Pennzoil or Badger Acqusition acreage is penetrated by the well bore ("New Leases"). In this circumstance, Basin would have the right to elect to acquire 6% of Denbury's working interest ownership in New Leases on the same terms and conditions, insofar and only insofar as said leases are included within the geographical confines of the unit and further limited to the unitized zone....
* * *
g. This obligation shall extend to the acquisition by Denbury of a working interest ownership in New Leases and shall not extend to any other rights and/or interests whatsoever acquired by Denbury, including, but not limited to, overriding royalty interests, production payments, net profits interests, mineral royalty interests and rights pursuant to operating or other similar agreements.
ExxonMobil is the owner of "fee land," more particularly described as:
T19S-R 19E Portions of Sections 18, 19, 24 and 25 comprising approximately 640 acres;
being located in Terrebonne Parish, State of Louisiana, which land is hereinafter referred to as the "Contract Area."
The Contract Area is situated in the vicinity of Denbury's operations in the Lirette Field. Pursuant to an agreement dated February 27, 2003, between Denbury and ExxonMobil ("the Denbury/ExxonMobil agreement"), Denbury acquired the right to drill a test well or an Initial Well in the Contract Area. Paragraph 5 of the Denbury/ExxonMobil agreement provided, in pertinent part, as follows:
At Casing Point[3] and after ExxonMobil has received a copy of the electric log over the objective sands for the Initial Well, ExxonMobil shall have 48 hours (exclusive of Saturdays, Sundays and holidays) to elect one of the following options:
a. ExxonMobil shall participate in the Initial Well with an undivided 33.33% working interest (subject to ExxonMobil's reserved 25% royalty interest over the Contract Area) and 50% net revenue interest in production from the Contract Area. Pursuant to such option to participate, ExxonMobil shall be liable for and pay its proportionate working interest share of expenses associated with the Initial Well incurred after Casing Point. Operations conducted within the Contract Area, including the drilling and completion of additional wells within the Contract Area shall be governed by an Operating Agreement in the format of Exhibit "E" hereto.
b. If ExxonMobil elects not to participate in the Initial Well, it shall issue to you a lease as set forth in paragraph 8 herein, reserving to ExxonMobil a royalty interest of twenty-five percent (25%).
Paragraph 8 of the ExxonMobil agreement provided as follows:
8. PROVISION FOR LEASE
a. If any well drilled hereunder is completed as a well capable of producing oil and/or gas in commercial quantities and you have complied with all obligations herein set out, and after you have furnished ExxonMobil with satisfactory evidence of:
(1) The completion and testing of said well;
(2) The actual direct costs and expenses of drilling, testing, completing and equipping said well for production; and
(3) The establishment of a regulatory, voluntary or declared unit around said well, if appropriate;
said well shall be considered an earning well, and you will, upon written request to the undersigned, be granted a lease covering ExxonMobil's interest under that portion of the Contract Area included in the unit established for the earning well.
b. As one of the conditions for receiving a lease for an earning well, you must furnish to ExxonMobil, free of cost, the information listed below for any well drilled pursuant to this contract.
In July 2003, Denbury timely drilled the Initial Well, identified as Denbury-Exxon Fee No. A-l, within the Contract Area to the Contract Depth and completed the well as a well capable of producing oil and/or gas in commercial quantities, pursuant to the terms of the Denbury/ExxonMobil agreement. Denbury also timely drilled an additional well, identified as the Denbury-Delta Securities Well No. 1 ("the subsequent well"), on lands pooled with the Contract Area to Contract Depth and completed the well in September 2003 as a well capable of producing oil and/or gas in commercial quantities.
At Casing Point of the Initial Well, ExxonMobil elected to participate with a working interest pursuant to paragraph 5(a) of the Denbury/ExxonMobil Agreement. Therefore, under paragraph 5(a) of the Denbury/Exxon agreement, "[ojperations conducted within the Contract Area, including the drilling and completion of additional wells within the Contract Area, [were to] be governed by an Operating Agreement in the format of Exhibit `E' [tjhereto."
ExxonMobil has not granted a lease to Denbury pursuant to paragraph 8 of the Denbury/ExxonMobil agreement. Instead, ExxonMobil and Denbury are operating pursuant to the terms and conditions of the Operating Agreement attached to the Denbury/ExxonMobil Agreement as Exhibit E. However, since the working interest earned by Denbury in the Contract Area is unitized with the Pennzoil and Badger Acquisition leases and the portion of the unitized reservoir underlying the Pennzoil and Badger Acquisition leases was penetrated by the well bore of the subsequent well, Basin requested that Denbury recognize its 6% interest in Denbury's working interest ownership in the Initial Well and the subsequent well, pursuant to the terms of the 1998 agreement. Denbury refused on the basis that it had not acquired its working interest pursuant to a lease, but instead, had acquired its working interest pursuant to an operating agreement, which was specifically excluded under the terms of the 1998 agreement.
Accordingly, on July .15, 2004, Basin instituted these proceedings for damages, asserting that it was entitled to receive an assignment from Denbury of an undivided 6% of the working interest Denbury acquired from ExxonMobil in the Lirette Field and alleging that Denbury had acted in bad faith in failing to execute and refusing to deliver to Basin its interest. Denbury answered, generally denying the allegations made by Basin.
Thereafter, the parties filed cross motions for summary judgment. In their respective motions for summary judgment, both parties acknowledged that there were no genuine issues of material fact and that the case presented a question of contract interpretation. Basin asserted that it was entitled, as a matter of law, to judgment recognizing its right to 6% of the working interest earned by Denbury under the Denbury/ExxonMobil agreement and ordering Denbury to make a full accounting to Basin for all costs and revenues associated with its working interest. Denbury asserted that Basin had no right to recover from Denbury, because Basin's rights were limited to new leases, Denbury had not acquired its working interest from ExxonMobil in the Lirette Field pursuant to a lease, but instead, had acquired its working interest pursuant to an operating agreement, which was specifically excluded under the terms of the 1998 agreement. Accordingly, Denbury asserted that it was entitled to judgment as a matter of law dismissing Basin's claims against it.
After a hearing on October 12, 2007, the trial court denied the motion for summary judgment filed by Basin, granted the motion for summary judgment filed by Denbury, and dismissed Basin's claim against Denbury. A written judgment in conformity with the trial court's ruling was signed on November 5, 2007, and it is from this judgment that Basin has appealed. On appeal, Basin asserts that the trial court erroneously interpreted the 1998 agreement and the Denbury/ExxonMobil agreement when it concluded that Basin was not entitled to share in the rights acquired by Denbury under the ExxonMobil agreement and erroneously dismissed Basin's claim against Denbury.

II. LAW AND DISCUSSION

A. Summary Judgment
A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine issue of material fact, and the summary judgment procedure is favored and designed to secure the just, speedy, and inexpensive determination of every action. La. C.C.P. art. 966(A)(2); Power Marketing Direct, Inc. v. Foster, 2005-2023, p. 8 (La. 9/6/06), 938 So.2d 662, 668. A motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. Id:, La. C.C.P. art. 966(B).
Summary judgments are reviewed on appeal de novo, with the appellate court using the same criteria that govern the trial court's determination of whether summary judgment is appropriate: whether there is any genuine issue of material fact and whether the mover is entitled to judgment as a matter of law. Power Marketing Direct, Inc., 2005-2023 at p. 9, 938 So.2d at 669.
Since the material facts are not in dispute, we look solely to the legal question presented by the motion for summary judgment, i.e., whether Basin was entitled, as a matter of law, to 6% of the working interest acquired by Denbury from ExxonMobil in the Lirette Field pursuant to the terms of the 1998 agreement. See Diamond B Construction Company, Inc. v. City of Plaquemine, 95-1979, p. 6 (La. App. 1st Cir. 4/30/96), 673 So.2d 636, 640 (when a contract is to be interpreted by the court as a matter of law, a motion for summary judgment is a proper procedural vehicle to present the question to the court).

B. Interpretation of Contracts
"Interpretation of a contract is the determination of the common intent of the parties." La. C.C. art. 2045. Louisiana Civil Code article 2046 provides that "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." Furthermore, when considering "[t]he words of a contract[, they] must be given their generally prevailing meaning;" if "the contract involves a technical matter," "jwjords of art and technical terms must be given their technical meaning." La. C.C. art. 2047. "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. C.C. art. 2050. "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." La. C.C. art. 2053.
The determination as to whether Basin is entitled to 6% of the working interest acquired by Denbury as a result of the Denbury/ExxonMobil agreement depends upon the interpretation of the 1998 agreement. The 1998 agreement provides that Basin is entitled "to acquire 6% of Denbury's working interest ownership in new leases acquired by Denbury." (Emphasis added). It further provides that "[t]his obligation [to assign a 6% interest to Basin] shall extend to the acquisition by Denbury of a working interest ownership in New Leases and shall not extend to any other rights and/or interests whatsoever acquired by Denbury, including, ... rights pursuant to operating or other similar agreements.'" (Emphasis added). Thus, Basin's right to acquire a 6% interest in Denbury's working interest is clearly and expressly limited to those circumstances in which Denbury acquires its working interest pursuant to "new leases." Furthermore, Basin's right to an assignment of 6% of Denbury's working interest is clearly and specifically excluded from those circumstances where Denbury acquires any other rights or interests, including rights pursuant to an operating agreement.
Denbury's right to receive any interest in the minerals in the Contract Area from ExxonMobilpursuant to a lease or otherwiseis governed by the Denbury/ExxonMobil agreement. Pursuant to the Denbury/ExxonMobil agreement, Denbury acquired the right to drill the Initial Well in the Contract Area. Upon reaching Casing Point, ExxonMobil was specifically required, under paragraph 5 of the Denbury/ExxonMobil agreement to make an election. It could either: (a) choose to participate in the production and expenses associated with the Initial Well, with an undivided 33.33% working interest, with all operations being governed by the operating agreement attached to the Denbury/ExxonMobil agreement; or (b) elect not to participate and issue a lease to Denbury pursuant to paragraph 8 of the Denbury/ExxonMobil agreement. Thus, under the terms of the Denbury/ExxonMobil agreement, ExxonMobil would determine whether the working interest acquired by Denbury would be pursuant to a lease or pursuant to an operating agreement.
The undisputed facts established that after Denbury drilled the Initial Well to Casing Point, ExxonMobil elected to participate in the well with an undivided 33.33% working interest in accordance with paragraph 5(a) of the ExxonMobil agreement. Therefore, ExxonMobil did not issue a lease as set forth in paragraph 8 to Denbury. As a result of ExxonMobil's decision to participate in the Initial Well and the subsequent well, Denbury's working interest was acquired pursuant to an operating agreementit was not acquired pursuant to a lease.
Since the obligation of Denbury under the 1998 agreement to assign 6% of its working interest to Basin is clearly and unambiguously limited to those circumstances in which Denbury acquires its working interest pursuant to a new lease and clearly and unambiguously does not include circumstances where Denbury acquires its working interest pursuant to an operating agreement, Basin is not entitled to 6% of the working interest acquired by Denbury from ExxonMobil in the Contract Area.
Basin contends, based on paragraph 8 of the Denbury/ExxonMobil agreement, that Denbury has earned the right to a mineral lease from ExxonMobil that ExxonMobil will issue a lease to Denbury upon Denbury's written request, but that Denbury has specifically requested that ExxonMobil not grant it a lease in order to circumvent its obligations to Basin.
As set forth above, paragraph 8 of the lease provided that "[i]f any well drilled ... is completed as a well capable of producing oil and/or gas in commercial quantities and you have complied will all obligations as herein set out, and after you have furnished ExxonMobil with satisfactory evidence of ... [certain enumerated documentation] said well shall be considered an earning well, and you will, upon written request to the undersigned, be granted a lease Basin contends that since the Initial Well and subsequent well have been completed as wells capable of producing oil and/or gas in commercial quantities, and Denbury has complied with all of its obligations under the Denbury/ExxonMobil agreement, the wells are considered earning wells, and Denbury is entitled to a lease.
However, if the Denbury/ExxonMobil agreement is reviewed as a whole, it is clear that the granting of a lease pursuant to paragraph 8 is triggered by paragraph 5(b). Therefore, Denbury would only be entitled to a lease pursuant to paragraph 8 if ExxonMobil chose not to participate in the Initial Well. But, since ExxonMobil chose to participate in the Initial Well (and the subsequent well) with an undivided 33.33% working interest under paragraph 5(a) of the Denbury/ExxonMobil agreement, paragraph 5(b) and the provisions for a lease under paragraph 8 are inapplicable.
Furthermore, paragraph 8, by its own terms, provides only for the granting of "a lease covering ExxonMobil's interest under that portion of the Contract Area included in the unit established for the earning well." (Emphasis added). Since ExxonMobil elected to participate in the Initial Well (and subsequent well) with an undivided 33.33% working interest (subject to ExxonMobil's reserved 25% royalty interest over the contract area) and to pay its proportionate share of the expenses under paragraph 5(a), it would not logically follow for ExxonMobil to then grant a lease of its "fee land" ownership interest to Denbury under paragraph 8. In other words, ExxonMobil would not choose to participate in the Initial Well (and subsequent well) with an undivided 33.33% working interest and agree to pay a proportionate working interest share of the expenses pursuant to paragraph 5(a), then grant a lease of its interest under paragraph 8, when it could have simply elected to grant Denbury a lease of its interest under paragraph 5(b) and not be liable for a proportionate share of the expenses of the Initial Well or subsequent well.
Accordingly, we find that Denbury was only entitled to a lease pursuant to paragraph 8 if ExxonMobil chose, under paragraph 5(b), not to participate in the Initial Well or subsequent well. Since ExxonMobil choose, under paragraph 5(a) to participate in the Initial Well (and the subsequent well) with an undivided 33.33% working interest, Denbury was not entitled to a lease under paragraph 8.
Furthermore, to the extent that Basin contends, based on the deposition testimony of David Fassnacht, the corporate representative of ExxonMobil, that ExxonMobil will issue a lease upon written request of Denbury, we disagree with Basin's interpretation of Mr. Fassnacht's testimony on this issue. When counsel for Basin inquired of Mr, Fassnacht whether ExxonMobil would accommodate Denbury if it requested a lease, Mr. Fassnacht stated: "I believe so, yes. We would  you know, assuming that we would have, you know, checked to make sure that they were in compliance with the agreement. We would have been in compliance with the agreement." (Emphasis added). These statements do not definitively establish that Denbury would be granted a lease upon written requestthey merely suggest that with regard to the granting of a lease, ExxonMobil would have complied with the terms of the Denbury/ExxonMobil agreement.
Lastly, Basin contends that Denbury has specifically requested that ExxonMobil not grant it a lease in order to circumvent its obligations to Basin. In support of its contention, Basin points to a letter dated April 8, 2004, from W. Thomas Cassard, Denbury's senior land man, to ExxonMobil, which stated as follows:
Reference is made to Paragraph 8 of the [Denbury/ExxonMobil] agreement. Be advised, at this time, [Denbury] does not desire to request that a lease be granted covering ExxonMobil's interest under any portion of the Contract Area included in any unit established for the earning well. Denbury will consider and recognize any interest credited to Denbury is purely contractual under the terms of the Joint Operating Agreement attached as Exhibit "E" to the [Denbury/ExxonMobil] agreement.
However, in Mr. Cassard's deposition testimony, he explained that he wrote that letter after Basin made a claim for an interest in Denbury's working interest, because he wanted to make it clear, to ExxonMobil, that it was Denbury's understanding that since ExxonMobil chose to participate in the well, they were not entitled to a lease and that its interest from ExxonMobil was a contractual interest and not a lease. Insofar as Basin contends that the letter was sent to ExxonMobil in an effort to allow Denbury to circumvent its obligations to Basin, we again note that, under the specific terms of paragraph 5 of the ExxonMobil agreement, it was ExxonMobil (and not Denbury) that would determine whether the working interest acquired by Denbury would be pursuant to a lease or pursuant to an operating agreement. Since ExxonMobil chose to participate in the Initial Well with an undivided 33.33% working interest, Denbury was not entitled to a lease under the Denbury/ExxonMobil agreement. Accordingly, Mr. Cassard's April 8, 2004 letter neither altered the rights of Denbury or ExxonMobil under the Denbury/ExxonMobil agreement nor the interests that were established pursuant to that agreement.
Therefore, based on our de novo review of the record, we find that under the 1998 agreement, Basin's right to acquire 6% of Denbury's working interest was expressly limited to "new leases" acquired by Denbury. Because the undisputed facts establish that Denbury did not acquire a "lease" and was not entitled to a "lease" from ExxonMobil, the trial court properly granted summary judgment in favor of Denbury, dismissing Basin's claim against it.

III. CONCLUSION
For all of the above and foregoing reasons, the November 5, 2007 judgment of the trial court is hereby affirmed.
All costs of this appeal are hereby assessed to the plaintiff/appellant, Basin Exploration, Inc.
AFFIRMED.
NOTES
[1] ExxonMobil is not a party to this proceeding.
[2] The Pennzoil and Badger Acquisition leases were defined and described in an "Assignment, Conveyance and Bill of Sale" dated October 29, 1998, from Denbury to Basin.
[3] The term "Casing Point" is defined in paragraph 5 of the Denbury/ExxonMobil agreement as "the point at which the Initial Well has been drilled to Contract Depth, tested, logged (and the data provided to ExxonMobil), and operations are suspended pending a decision to set pipe and effect a completion." Additionally, the term "Contract Depth" is defined as "'a depth of 10,000 feet below the surface or to a depth sufficient to test the 10,250' Sand (CIB CARST) formation which is defined as that sand interval between the depths of 9590' and 10,150' identified on the electric log for the Union Producing Delta Securities #5 well located in Section 19, T19S-R19E, Terrebonne Parish, Louisiana, whichever is the lesser depth." On August 8, 2003, Denbury and ExxonMobil amended the agreement to define Contract Depth as "11,500' TVD within the existing Contract Area."